Mr. Weiss? Good morning, Your Honor. My name is Jeremy Weiss, and I'm an attorney of record along with my co-counsel, Brian Gaddy, for Petitioner Ernest Johnson. I'm not going to start today talking about the history of the case, because I think the Court has that adequately briefed in our pleadings. What I want to talk about specifically are two arguments related to the District Court's order of dismissal on a Rule 12b6 motion to dismiss. The District Court erred in this case on two bases. One, that the Court held that Mr. Johnson to a higher pleading standard than is required by the Supreme Court precedent in Iqbal and Twombly. And then second, the District Court erred by adding an element to the Glossop standards for lethal injection claims that are simply not required and ruled in part on that basis in dismissing Mr. Johnson's claim. The Glossop standards are fairly clear. In order to prove a case, an Eighth Amendment violation, Mr. Johnson and other plaintiffs would have to prove that there's a substantial risk of serious harm that is sure or very likely to occur as a result of the execution protocol. And then second, they have to plead and prove an alternative method of execution that's feasible, readily implementable, and significantly reduces the harm to the inmate. We think we've done that in this case on multiple occasions, but we're here on the second amended petition or complaint that was filed in the District Court for the Western District of Missouri. And let me address the two arguments that were addressed by the District Court. One is related to the substantial risk of serious harm. As this court is well aware on the pleading standards, and that's what we're here, and I kind of want to emphasize that we're here not on a summary judgment standard, but we're here on simply whether Mr. Johnson adequately pled the claims and offered a sufficient factual basis for the court to find that his lethal injection claims are plausible. The District Court agreed that Dr. Zivit, who was the expert that Mr. Johnson relied on along with the affidavit that he provided, was qualified to give the opinions that he stated. Two, that Mr. Johnson was and is at severe or serious risk of seizures as a result of his medical condition, and his medical condition being that he has a malignant brain tumor. That opinion was pretty iffy, wasn't it? Which opinion, Your Honor? The opinion you're talking about. Dr. Zivit's opinion? Yeah. I don't believe it was. What he said throughout his affidavit was he walked through, one, the history of Mr. Johnson's medical condition starting in 2008 when he had the tumor partially resected. In 2011, there was an MRI that was conducted that showed that he had scarring tissue and he had a compressed portion of his brain, the result of which, after looking at his medical record, showed that he had a history of seizures. Yes. What he talked about was looking at his record and history of seizures along with his use of anti-seizure medication, combining that with the use of pentobarbital, a substance that's used, the sole substance used by the state of Missouri. Pentobarbital is an anti-seizure medicine in and of itself, isn't it? No, it's not. It's actually a barbiturate that, similar, he analogized it to methotrexatol, having a similar structural compound, and that the use of that was actually a seizure-inducing medicine, and that given his heightened risk of seizures— That was his opinion, right? That's correct. Yeah. And that's the only opinion before the court. I mean, there is nothing to rebut that because the state hasn't answered. He characterized the risk, though, as a significant risk rather than something that was likely or very likely to occur. Is that correct? That's one of the things he said. He also said in paragraph 15 that the Missouri execution protocol will increase the likelihood of a seizure with a very high degree of probability. What does that mean? I mean, what does that mean? Well, I think that he's using his medical terminology that says that the combination of the pentobarbital, the introduction of pentobarbital to Mr. Johnson given his unique medical condition, increases the likelihood to a very substantial probability that it's going to occur. Well, why doesn't he just say that then? I mean, we're familiar with Dr. Zivit, and why doesn't he just say what you just said if that's what he means? What he said is it'll increase the likelihood of a seizure with a very high degree of probability. Now, in normal English, that sounds like it's highly probable that it will increase the likelihood of a seizure, but it never says how likely the seizure is. In terms of a percentage? In terms of whether it's sure or very likely to occur. It just said it'll increase the likelihood, but if it increases the likelihood from 5% to 10%, then it's not sure or very likely to occur. So I don't understand why you guys don't just – apparently he can't say that it will make it sure or very likely to occur, or he would say that, right? Well, I think those are legal terms and not necessarily medical terms. He's using medical terminology. The legal terms are what the court has used in terms of sure or very likely. I think the opinion is pretty iffy, like I said at the beginning, and you said no. Well, the district court doesn't even particularly agree with that. The district court said that, one, they agreed that pentobarbital causes seizures and that pentobarbital seizures will be extremely painful as a result. The only thing that the district court seemed to disagree on was the percentage of likelihood that it's likely to occur, whether it's sure or very likely. What we have alleged and what Mr. Johnson has alleged in his petition, one, we did use the terminology of sure or very likely. Is it your position you prevail if there is any possibility then of this trauma occurring, or do we evaluate that to see how strong your case is? No, I don't believe that there – if there is any possibility. I don't think that's the standard, and that's not what we pled, and that certainly wouldn't meet the GLOSSIP standards to do that. Again, we're at the pleading stage. We would have to prove ultimately if we get into – if we are given the process that we've asked is we would have to prove that it is sure or very likely. All we would have to do at this point is whether we are pleading is sufficient, and the factual support is sufficient to show, to demonstrate that it is plausible that Mr. Johnson can ultimately support his claim. And we think that that's sufficient based on what we have pled. I'd also point out to the court that Dr. Zivit, as Judge Colleton alluded to, is very familiar with Dr. Zivit. Dr. Zivit was also – he's been the expert in a number of cases, the McGehee cases out of Arkansas, but also most notably out of the Bucklew case that was recently before this court just a couple of months ago. In that case, and that case came before this court twice, in the initial one, in the pleadings that ultimately survived a motion to dismiss in the very same courtroom or courthouse that this case emanates from, Dr. Zivit said it was a substantial risk and a great risk. That's all he said in his affidavit as to Mr. Bucklew's probability that he would suffer an Eighth Amendment violation as a result of his unique medical condition combined with the use of pentobarbital. He didn't use the specific terms, sure or very likely. That passed muster on multiple occasions and ultimately got him past the motion to dismiss stage. He in this case has actually said – has provided an additional factual basis, stronger factual basis, which we've pled, to support his findings. So I think that – and the district court talks about this in terms of probabilities of it likely to occur. This is a unique situation in that if you give pentobarbital in the amounts that the state of Missouri does, it is going to kill the individual. It'll kill Mr. Johnson. It'll kill Mr. Bucklew. It'll kill all of them. The question is – so there's not the ability to test or to demonstrate through medical testing whether – what the reaction will be for an individual. Equally, because Mr. Johnson has this unique medical condition, it's the combination of the two that Dr. Zivit says raises the possibility to a – not the possibility, but the probability to a great degree. And that's given his seizure history, given the seizure-inducing medication, and then also the impact of pentobarbital being a pain-inducing medication. The combination of all of those, which we have all pled – and again, this is at a motion to dismiss stage – makes it plausible that Mr. Johnson can ultimately prove his Eighth Amendment violation. The court gave an alternative – or gave a second basis, which was on the alternative method of execution. And they said that it has to be readily available, feasible, and readily implementable. What we have proposed, and what Mr. Johnson proposed in his Second Amendment complaint, was the use of nitrogen gas. Nitrogen gas, or the use of gas as a method of lethal injection, is authorized by Missouri statutes. And we provided the court with a basis to find that the use of nitrogen gas, one, is allowed under Missouri law, is readily implementable, meaning that the – doesn't require the use of a new facility, doesn't require the use of special techniques or methods. The things to implement it are easily available. Nitrogen gas is an inert gas that is available on the open market, and the use of a hood or a mask would allow for a simple process. And then finally, we've alleged that the use of lethal gas, nitrogen gas specifically, because it is not a seizure-inducing substance, that that alone would allow him to pass the 12B6 stage. And that we have alleged a readily available, feasible, and readily implementable alternative. Now the district court added some things. One, they said that we didn't plead, or Mr. Johnson failed to plead, that Missouri was willing to implement nitrogen gas as an alternative. That's not an element in Glossop. That's not something we have to prove, and in fact, it would be something that would be impossible to prove. That the defendant in the case, if they say that they're not willing to implement it, then they win. That's not something that Glossop requires, and that's not something that we should be held to. The district court also sort of added affirmative defenses and affirmative facts that were outside of the record. They talked about protocol, training, time to develop rooms, etc. All of which might be, if we get into a factual scenario where we're discussing after discovery, those might be defenses that would be put up by the defense. In this case, or by the state, saying that their protocol would take too long and it would take additional training. Those are all facts that are outside of the record and shouldn't be considered by the court. All we have to look at, and all this court should look at, is whether Mr. Johnson provided a plausible alternative that's readily available and easily implementable. I note that, again, going back to the Bucklew case, the specificity of information provided in the pleading in Mr. Johnson's case far outweighs the specificity provided by Mr. Bucklew's lawyers. Again, in the same courthouse, different courtroom, but same courthouse, that it had survived a motion to dismiss. He just said that nitrogen gas was readily available and easily implementable. Took two paragraphs, and that was it. We have provided substantially more facts to support Mr. Johnson's plausibility of his claim in this particular case. Finally, I'd say that it's notable in this case that this is the third time that this case has been plead in the district court. On the first time that the state acknowledged, even pleading fewer facts than what we have here, the state acknowledged that Mr. Johnson had provided an adequate and readily implementable alternative. That was back in 2015 when we were seeking a motion for stay of execution for Mr. Johnson. Under the totality of this, Mr. Johnson has met the standards. There are not higher pleading standards for people petitioning in lethal injection cases. Iqbal and Twombly both apply. We have met the notice pleading standards under Rule 8, and the district court's decision to dismiss the case under what we have pled and what we've provided to the court at this stage of the litigation is more than sufficient to meet the pleading standards. If there are no additional questions, I'll yield my time. Thank you, Mr. Weiss. Mr. Goodwin. Good morning, and may it please the court. The district court's decision in this case should be affirmed because the district court properly applied this court's precedent when finding that Mr. Johnson failed to plead facts that would establish either prong of gossip. Mr. Goodwin, are you familiar with the Bucklew case? Yes, Your Honor. Since the Supreme Court has granted cert in that, should this panel hold this case until the court has evaluated that case? Does that have any connection with his? It does not, Your Honor, and the court should not hold this case. There are four questions in Bucklew, three of which relate to discovery or summary judgment issues, and the third question relates to the second prong of gossip. But the district court in this case properly found that Mr. Johnson failed to plead facts on either prong. So even if Mr. Bucklew prevails at the United States Supreme Court, which the department doesn't believe he will, but if he were to prevail on his argument about the second prong, Mr. Johnson's case still would be properly dismissed under 12b-6 because he failed to plead facts that establish that Pinto Barbatal is sure or very likely to cause severe pain. Your Honor described- What about the first time this case was before the court and the court denied the motion for stay and then the Supreme Court granted a stay pending appeal? Are you familiar with that history? I am, Your Honor. Now, you think that the standard for granting a stay pending appeal is something like significant possibility of success on the merits? Yes, Your Honor. So what do you make of the Supreme Court's order from November of 2015 that granted a stay pending appeal, citing Dr. Zivit's affidavit and the part where Dr. Zivit says, as a result of Johnson's tumor, et cetera, a substantial risk of serious harm will occur during his execution as a result of a violent seizure that may be induced by the Pinto Barbatal injection? And I note that he's upgraded his affidavit since then to say that will be induced by the injection. Why isn't that a pretty strong signal that he's at least cleared the pleading standard? Because, Your Honor, the 2015 stay from the United States Supreme Court said that this court should decide if the complaint was properly dismissed for failing to state a claim or if the case should be allowed to proceed to summary judgment. It's the Department's position that if the United States Supreme Court had wanted the stay to take effect until the case had proceeded through summary judgment or through a trial, that the court would have said so in the stay. Instead of providing this court with the opportunity to— Well, they're not going to get into that. They're not going to say it should prevail through summary judgment when the case was only on a motion to dismiss. All that was before them was an appeal in that posture. But doesn't it mean there's a significant possibility of success on that appeal? Your Honor, it's not the state's position that Mr. Johnson is going to be or has been able to plead enough facts to prove sure or very likely. I do acknowledge that the fact that there was a United States Supreme Court stay in the case is unusual. And I understand that the interface between that and the district court's decision will weigh on this court's mind when it looks to Mr. Johnson's second amended complaint. What about paragraph 14 of the Zivit affidavit? Why isn't that enough to at least get over the pleading standard? In paragraph 14, Your Honor, and I don't have a copy of the affidavit in front of me, my recollection is that that's the paragraph that discusses methohexadol. No, it says, As a result of Mr. Johnson's tumor defect and scar, a substantial risk of serious harm will occur during his execution as a result of a violent seizure that is induced by pentobarbital ejection. Generalized seizures such as the one that would occur in Mr. Johnson are severely painful. Right. Why isn't that enough to get over the pleading standard and require you to then challenge Zivit's credibility or accurate reliability? This court in McGehee found that that language, a significant possibility, was not enough to meet the, quote, rigorous standard of sure or very likely found in Glossop. The district court followed this court's guidance. The United States Supreme Court refused to grant certiorari from McGehee, and so that's why that paragraph doesn't meet the sure or very likely standard. And part of the difficulty, Your Honor, with what Dr. Zivit's affidavit talks about or the way he presents the claim is he doesn't actually say what will happen if pentobarbital is applied to Mr. Johnson. He doesn't even say what will happen if methohexadol is given to Mr. Johnson. He says that there is, in his view, a likelihood that the rate of seizures will go up. I think the court's earlier questions to opposing counsel. Yeah, he does say that you're right about that, but then he says generalized seizures such as the one that would occur in Mr. Johnson are severely painful. Isn't that a statement that it would occur? I think, Your Honor, my understanding of that paragraph is that that is the type of seizure that Mr. Johnson experiences. Elsewhere in the affidavit it talks about how it's a full-body seizure. That's the typical seizure he experienced, begins in his legs, then progresses to a full-body seizure where he loses consciousness. That's different than some other type of seizure, a grand mal seizure or some other type. That's my understanding of Dr. Zavod's affidavit with respect to that particular portion. You mean you think he's referring to a seizure... Well, say that again. You think he's not referring to the kind of seizure that Johnson would suffer? Go ahead. I'm sorry, Your Honor. I didn't mean to interrupt. I think he's referring to the type of seizure that Ernest Johnson experiences. Each individual person can experience different types of seizure. But you think he's saying that's the kind he would experience as a result of pentobarbital? That's not my understanding from that paragraph, Your Honor. I think the Court's earlier questions, if Dr. Zavod was able to say that the application of pentobarbital to Ernest Johnson would cause a seizure, he would have said that. Is that how he pronounces his name, by the way, Zavod? I'm sorry, it's Zivit. I don't know one way or the other. My belief is that it's Zivit, although I think it's spelled Zavod. That's my mistake. The Court's earlier question about the probability, I think the Court's exactly right that that refers to the confidence that Dr. Zivit has with respect to his belief that there's an increased likelihood for a seizure. I don't think that that language explains how much more likely a seizure would be in Mr. Johnson's particular case. This Court, I think, very aptly points out the rationale behind the sure or very likely requirement, which is that it's designed to prevent embroiling the states in never-ending litigation concerning the adequacies of the execution procedures. And that's the situation that the state has found itself in here. McGehee also then continues on to the next page and says, without a scientific consensus and with a lack or a small amount of reliable scientific evidence, a challenger might never be able to prove that a method of execution is sure or very likely under the Eighth Amendment. And that's the situation that Mr. Johnson's in. McGehee was a stay application. That's correct. So there was evidence presented and findings of fact and so forth. That's right, Your Honor. But the point was there he hadn't proved. Right. The judge hadn't found sure or very likely. Glossop requires both a pleading and a proving. And the use of the phrase sure or very likely is not a magic talisman. It's a legal conclusion. And there has to be facts that support that conclusion. Dr. Zivit's affidavit never explains why or to what extent Pender-Barbertol will increase the likelihood for a seizure from possible to sure or very likely. Without facts to support that, he can't meet the first prong. Likewise, Mr. Johnson has not pled facts that establish the second prong, that there is an alternative method of execution that's feasible, readily implemented, and would significantly reduce a substantial risk of severe pain. So would it be accurate to say the doctor's opinion was based on the barbiturate nature of Pender-Barbertol, but not studies or tests done specifically with Pender-Barbertol? I think that's the most generous reading of the doctor's affidavit. The doctor explains that methohexadol has all of these properties and that methohexadol is used in electroshock therapy and that methohexadol is a barbiturate and is a close cousin of Pender-Barbertol. But that sort of pleading by analogy doesn't allow an individual to survive a motion to dismiss. He needs to plead facts about Pender-Barbertol, and he has not done so in this case. Is your position that the test is very likely, not very possible? Sure or very likely. Yes, Your Honor. With respect to the second prong of Glossop... What is the state's position on whether nitrogen hypoxia is feasible and readily implemented? In Bucklew, we just went through this, and the state didn't dispute that it was feasible and readily implemented. That's correct, Your Honor. Now you're switching on this case, apparently. I would not characterize it that way. I think that the state's position and discovery in the Bucklew case was that because there was so little evidence on the other prongs, we didn't need to engage in the additional discovery for the way that nitrogen would be applied. In this case, there are no facts that talk about the implementation, which I would describe as the process of getting the nitrogen from the tank to the prisoner. There are no facts in this case that have been pled that establishes how that would happen. There is a report, but the district court pointed out that the report is full of cautionary statements that talk about the risks and the dangers and the fact that states are going to need to have a more advanced or more detailed protocol as opposed to just putting a bag or a hood over someone's head. Has Oklahoma actually implemented a protocol? They have not, Your Honor. My understanding is that the Oklahoma legislature adopted a statute that authorizes the use of nitrogen hypoxia. The Department of Corrections in Oklahoma had a press conference saying that they were going to start investigating to create a protocol, but they have not completed that yet. So why isn't the pleading enough to raise the question whether he can prove that it's readily implementable? Because he has to plead facts, Your Honor, that talk about the way in which the nitrogen hypoxia would be implemented. And the reason for that, I think, one of the reasons, is that imagine that an inmate pleads or doesn't plead any facts about the way in which nitrogen could be implemented in this case. There's a wide range of possibilities, and I think it's safe to say that as soon as the state were to pick one, then there would be a new complaint alleging that there's a better way to implement it. Additionally, I think the facts of that Oklahoma report talk about even a small amount of oxygen that enters the environment has a serious chance to disrupt the entire execution. That's the reason why the United States Supreme Court imposed the language about a feasible and readily implemented alternative. And in McGehee, this court talked about how there has to be access to the alternative and that the state has to be able to carry out the alternative method relatively easily and reasonably quickly. I just wonder whether you're requiring too many detailed facts. I think, Your Honor, there's a point at which that could be true. The Supreme Court, after Twombly, had that other Erickson case where they remanded and said detailed factual pleading is not what we meant by Twombly. That's right, Your Honor. And he does say in here that the nitrogen gas is feasible and readily implemented, including use of a hood mask or some other type of medically enclosed device. I just wonder whether you're asking too much to say, well, he's also got to give all the details about how that would actually work or whether that's something for possible summary judgment or bench trial. And I understand the court's concern because there has to be a level, Rule 8, a level of respect between the requirement to plead allegations and the potential for the pleading requirement to go overboard. In Twombly and Iqbal, the United States Supreme Court talks about how Rule 8 is a departure from the prior very high pleading standards. But the United States Supreme Court in Iqbal also says that it does not, Rule 8 does not unlock the doors to discovery for a plaintiff who only has conclusions. What we have in this case is a lack of facts that talk about from tank to offender. I think it would be unfair, and it's certainly not what the Department's trying to do in this case, to say that the offender must plead an entire protocol, open and closed, at the very beginning of a case. That would be the protocol that the court has seen in various other cases. The Department's position is not that an entire protocol needs to be pled in the opening complaint. But there need to be some facts that talk about how the gas moves from a tank to the offender. And that even sets aside the fact, although it's not directly pled here, there are different types of nitrogen. Medical-grade nitrogen is not used in welding or cooking. It's used in medical applications. But even setting aside that, that might be a closer question, Judge Colleton, to requiring an offender to plead a particular grade of nitrogen. That might be over the line. What do you mean by how it gets from the tank to the offender? He says use of a hood, a mask. You mean he needs to put a sentence that says the gas would go through a tube from the tank to the mask, and that would be enough? Well, and a better description or more information about a mask. There are several types of masks. And the Oklahoma report talks about the very real dangers in using a mask. You know, the Oklahoma report talks about how one to two breaths might be enough. But that's of pure nitrogen. But that if there's any oxygen that invades that breathing, then things begin to go awry. And so, you know, this isn't a situation where, you know, just talking about the existence of a mask, well, does that mean a gas mask? Does it mean the type of mask that they might use at a dentist's office? Is it some other option? More specificity there is necessary for a court to be able, or for the department to be able to talk about or make a decision about whether that is feasible and readily implemented. Well, we're at the pleading stage here, right? Yes, Your Honor. And since the federal courts accept notice pleading, isn't this enough? You're asking for some fact pleading, which way back when the notice pleading was adopted, the author said all you need to do is I'm hurt and it's your fault. And that was enough to get into the proceeding and then discovery and evidence and so forth. And it's not the department's position that the court should go all the way to fact pleading. The department disagrees with Mr. Johnson's position that there's some sort of heightened pleading requirement here. But merely saying a hood or a mask or some other delivery method is not enough to show an alternative method of execution that is feasible and readily implemented. There needs to be something more, and we don't quite have that in this case. The district court talked about the fact that the department might need to have a protocol, that the department would need to address the risk of the oxygen contamination, which is what we've just discussed, and that people would need to be trained. Do you defend this reasoning where the district court says that Johnson didn't plead? Missouri's willing to perform this type of execution? I disagree with the way that Mr. Johnson has presented that. I think that's on page 9 of the district court's decision where the district court talks about comments by a former attorney general in relation to a gas chamber. The sentence says Johnson has not pled facts indicating Missouri is willing to perform this type of execution, which suggests it may not be feasible. Now, if that means that Missouri's unwillingness to do it makes it not feasible, I wonder whether that's correct. And that's not how I understand that sentence to read. My understanding, Your Honor, is that that is a recognition of this court's opinion in the earlier Buckley case where the Department of Corrections had made the statement saying we won't use indigo blue or indigo carmide, and this court found that that was an indication about feasibility. I think that the court's skepticism about if a state just says we refuse to ever do anything other than this current method, that does raise some very legitimate concerns. And I see that I'm almost out of time, so I would just ask the court to affirm the district court's decision because Mr. Johnson has failed to plead facts that establish either prong of gloss-up, as he's required to do under 12b-6. All right. Thank you, Mr. Goodwin. Thank you, Your Honor. Mr. Weiss, you're alone. Thank you, Your Honor. Just a couple of things that I wanted to address that came up in the state's argument. One, Judge Beam, you asked about the Buckley case, and we filed a motion with the court to stay at least the argument in this case on that basis. Buckley did. The Supreme Court took four questions, three of which were proposed by Mr. Buckley himself, and one was added by the court. Two of the questions specifically go to prong two of the gloss-up standards, which is whether he is required in an as-applied claim or whether any plaintiff in an as-applied claim is required to plead their own specific alternative method of execution, setting aside the difference between a facial challenge, like this court faced in Zink, to Missouri's execution protocol. That's one where I believe Judge Kelly filed the dissent in Buckley, and in a prior case judged by Judge Kelly, and I can't recall the third judge, had all suggested and signed on to the idea that a plaintiff having to prove or come up with their own bespoke execution protocol in an as-applied claim was not required under or shouldn't be required under a Supreme Court precedent. If the Supreme Court holds in Mr. Buckley's case that it is not required, then at least one of the bases for the district court's dismissal would go away, assuming this case is still pending and active. So we think on that basis it would be worthwhile to hold this case until Buckley is decided. I also wanted to address a lot of the arguments that the state made talked more about proving the allegations, which undoubtedly are challenging. I think the Supreme Court has talked, along with this court, have talked about the challenge in ultimately maybe proving these cases if they get to a trial or an adversarial proceeding. But that's, again, not the stage that we're at. We're at simply the pleading stage. So while there may be challenges in terms of ultimately finding an expert and proving the ultimate claims, that's not what we're here to decide. We're here simply to decide whether the district court properly applied the Supreme Court precedent and Rule 12b-6 to the pleadings that were before the court, and we think they did not. We talk about McGehee, and the state relied on McGehee a lot. McGehee was an interesting case. One, it was after a four-day hearing, adversarial hearing in the district court of Arkansas. And it came to this court, as Judge Colleton noted, on a motion for stay of execution. The standards by that were really hard to meet. And in the court's opinion, the court talked about, one, the dilatory nature of the plaintiff bringing their claims, two, the equivocal nature of the evidence that was presented to the district court. That's none of what we have here. And, in fact, when we look at the first time that this case came before this court, the stay of execution, or at least the stay pending the completion of the appeal, was at a much higher standard than what we have even as we stand here today. We met that, meaning, at least from the Supreme Court's perspective, the affidavit that was presented, the prior affidavit that was presented by Dr. Zivit, was substantial enough to meet the pleading standards, or at least meet the standards to obtain a stay of execution. Well, I think it's only the latter. They didn't say it was enough to meet the pleading standard. They said the court of appeals would be required to decide whether the complaint was properly dismissed. That's correct, and I think in a very— Okay, if that's correct, you just said they met the pleading standard or at least that they met enough for a stay. Meeting the standards to show likelihood of success on appeal is much more challenging than meeting the pleading standards that we can show that we have at least alleged a plausible lethal injection claim. So, in court, Judge Loken acknowledged that in the second Bucklew opinion, in the Bucklew opinion on reversal after the stay of execution, said that—acknowledged that Mr. Bucklew had met the standards and that it required the court to reconsider whether the motion to dismiss was properly granted at the district court stage. And he acknowledged that that stay was important in the court's mind in terms of evaluating whether the pleading standards were— if it could meet that standard, then the pleading standards probably met as well. We think that the district court erred. The district court required too much, and it requires a pleading standard that's way beyond what is required by Iqbal and Twombly. We think that we've met that, and we would ask the court to reverse. And our test is, have you pled plausibility? Correct. Thank you, Your Honors. Thank you, Mr. Weiss. Court wishes to thank both counsel for your argument to the court this morning. The briefing which you've submitted will take the case under advisement. You may be excused. Madam Clerk, would you call case number two for the morning? The next case for argument is Marsh v. Phelps County. Ms. Schiffer-Miller?